## HAYES *v.* BONA *et al.*

As a general proposition it may be stated that under the Spanish law, a sale of real estate by parol would not be void *per se*, and that the distinction between parol contracts and specialties, known to the common law, does not exist under the civil law or the Mexican system of jurisprudence heretofore in force here.

By the civil law every conveyance of land was required to be made before an Escribano. or if there was none, then before the Judge of the First Instance.

Though there is some doubt whether this law was in force in California, yet it seems that by the custom of the country, conveyances were required to be in writing, and although all the forms prescribed were not strictly followed, still it was necessary that the instrument should contain at least the names of the parties, the thing sold, the date of the transfer, and the price paid.

Where the defendants in ejectment set up in defence title derived under an instrument in writing, claimed to be a conveyance, but lacking all these requisites: *Held*, that such defence was insufficient against a party holding a subsequent deed from the same grantor.

APPEAL from the District Court of Fourth Judicial District.

Action of ejectment to recover possession of fifty vara lot No. 32, in the city of San Francisco.

Both parties claim under Domingo Feliz, the original grantee of the land. The plaintiff proved the grant to Feliz in 1843, and a conveyance by Feliz to plaintiff in 1854.

The defendant put in evidence the following endorsement on the grant claimed to be a conveyance by Feliz to Francisco De Haro, of which the translation admitted in the record is as follows : " The contents of the present document having received in grant the lot that by the foregoing title was ceded and adjudicated, I declare before the present witnesses I cede it to my political uncle, Don Francisco Haro, and I renounce in his favor all my right and action of property, that he may possess it, occupy it, and do with it whatever may be convenient to him. I deliver to him this title in proof of my cession, and I renounce in favor of his person, that he may have as security and proof at any time and before any authority of the place where this transfer may be presented, to the end that may be convenient to my said uncle. On account of not knowing how to write, signed at my request,

"For the grantor I sign it,
" MANUEL SANCHEZ,                    " J. DE JESUS NOE.
" FELIPE SOTO."

The defendants also proved a further endorsement on the grant, to wit : a conveyance by F. De Haro to Johann Jacob Dopkin, dated February 10th, 1845, and a further endorsement, viz.: the certificate of W. Bartlett, Chief Magistrate, dated November 13th, 1846, to the effect that " the within title" had been presented to him for examination and record, and that after the examination of the original record of land titles, he found it recorded, and thereupon recorded the same in full in the new register of examined titles.

The defendants then offered in evidence the latter record, known as " Book A, of Original Grants," which, on plaintiff's objection, was ruled out. Defendants proved by Noé, that he signed the endorsement on the grant at the request of Feliz, who could not write ; defendants then proved conveyances to them from Dopkins, and the only question passed upon is the validity of the endorsement claimed to be a conveyance from Domingo Feliz to Francisco de Haro. There was some evidence on both sides as to the customs of the country in executing conveyances, of which the summary will be found in the Opinion of the Court. Sanchez, one of the witnesses to the instrument, swore that his signature was forged, and there is considerable doubt thrown by the evidence upon the good faith and genuineness of the transaction. Soto, the remaining witness, was dead, and some witnesses swore he could not write. Noé testified that

he could write his name, and that he Noé had seen him do so on several occasions. Under the instructions of the Court below the jury found a verdict for the defendants, and judgment was entered accordingly. Motion for new trial made and overruled, and plaintiff appealed.

*Thomas J. Sutherland* for Appellant.

There is no conveyance in writing by Domingo Feliz to Francisco de Haro, and by the Mexican law real estate could be transferred only by an instrument in writing, duly authenticated. 5 Febrero Mejicano, p. 55, 56, § 99; 2 Sala, Paris Edition, 1844, p. 264–'5, § 24; 3 Sala Mejicano, p. 106, § 1, p. 110, § 6; 4 ib., p. 282–'3, § 53, 54; 3 Instituciones del Derecho Publico, p. 51, § 39; Ordenanzas de Tierras y Aguas, p. 110, § 6, and p. 170; Escriche's Diccionario (new edition), Title, "Venta," "Instrumento Publico," Escritura Publica," "Escrito Autentico."

The Court will find in the case of Hoen v. Simmons, 1 Cal. R., 122, a translation of the authority cited from Ordenanzas de Tierras y Aguas. The page there given is 144 of the old edition. The same will be found on page 170 of the new edition of 1853, and having recently compared the translation as given in Hoen v. Simmons with the original, I am prepared to say that it is in all respects substantially correct, and although not a full translation of all there contained, yet there is nothing in the authority conflicting with the portions translated.

The instrument signed by Noé, and purporting to convey the title and interest of Domingo Feliz in the premises, was not executed according to the requirements of the Mexican law, so as to be binding and of effect under such law.

*Sidney V. Smith* for Respondent.

The first objection raised by appellant is that the transfer from Feliz to De Haro, (admitting as a fact that it was authorized to be signed by Noé,) was utterly void, as it lacked all the requisites which under the laws of Spain and Mexico were absolutely necessary to constitute a valid act of sale, and that the title to real estate could only pass by an instrument in writing possessing all these requisites. Those requisites are—

1. That it be made by and before an escribano, or other public officer duly appointed for the purpose.

2. That it contain the names, appellations, and place of residence of the contracting parties.

3. That it express the day, month, year, and place of its execution.

4. That it contain the names, appellations, and place of residence of the witnesses.

5. That the names of persons, places, dates, and sums of money

shall not be expressed by initials, abbreviations, or figures, but written out at length.

6. That it be signed by the contracting parties and the witnesses; if the contracting parties could not write then that it be signed by one of the witnesses or any other person who does know how to write, the escribano stating at the end that the witness or other party signed for the contracting party, he not knowing how to write.

7. That it be written out clearly, without errors, erasures, or interlineations.

8. That the whole contract be clearly set out.

9. That the escribano, or other officer, certify at the foot of the instrument that he personally knows the contracting parties, or if they be not known to him, that the two witnesses shall, under oath, certify they know them, and in such case the escribano must state their names and places of residence, and certify that he personally knows them.

10. That it be written on stamped paper.

All the foregoing requisites are absolutely required to make a perfect *instrumento publico*; that is to say, an instrument which shall without further proof, be full and complete evidence of itself.

When all this has been done, this instrument so executed and signed, and which is styled the *Protocolo*, is filed away and kept by the escribano, and he then makes out the *traslados* or *ejemplares*, or copies, for the use of the parties, if required. Escriche, Article Instrumento Publico.

The foregoing requirements demand a tolerably high state of intellectual and legal knowledge on the part of the public officer; a far higher degree than could possibly have been found in San Francisco at the time the transfer was made; when the population was thoroughly ignorant, and the public officers were merely those who had been elected from among their number. Escribanos were not known here, and though it is true that the Judges of the First Instance were authorized to act as such. (See opinion in Hoen *v.* Simmons, 1 Cal. 122.) Yet it is doubtful if there ever was a Judge of First Instance within the limits of San Francisco. It was not until the decree of March 2, 1843, (see Mena *v.* Le Roy, 1 Cal., 220; also, Panaud *v.* Jones, id. 508,) that alcaldes were authorised to perform the functions of Judges of First Instance in those districts where there were no such judges. And the transfer in question was made somewhere between 1843 and 1845.

It may, therefore, be fairly presumed, not only from the absence of the proper officers at the time, but also from the well known character of the Mexican population at that early day, that none of the strict forms of law were complied with in the transfer of land.

But Escriche, under the same title, *instrumento publico*, (subdivision 8,) says: "That though the public instrument may be null or invalid on account of its want of solemnity or form, it is not therefore to be understood that the obligation therein contained loses its force if it can be established and proved by other means which the law has established," viz: by the proof given by witnesses and by written evidence. So also under the article *instrumento*, he says: "The word 'instrument' is often confounded with the word 'title,' but in strictness they are very different, and mean very different things."

In Spanish and Mexican law, written instruments were divided into two great classes, the public and the private. The public instrument was required to be executed according to all the forms hereinbefore spoken of; the private required no forms whatever.

The public instrument executed in the prescribed manner proved itself; so that when the words "*vicioso*" and "*nulo*," are used by the writers, it was simply to express the idea that the instrument did not of itself create faith; "*da fé*" ò "*haga fé*." It became, in other words, a private instrument, which produced no faith of itself, but required to be proved. It may safely be assumed from the impossibility of carrying out the strict rigor of the law in relation to the public instrument, that all the transfers of land in California were by the *instrumento privado*, that is, where a writing was used at all.

The law of the "Recopilacion de Indias," cited in Hoen *v.* Simmons, will be found on the seventy-third page of the third volume of the "Recopilacion." It is a part of the law relative to the "Alcabala," or royal duty, and was intended solely to provide for the more effectual collection of that duty which was *inter alia*, payable on the transfer of lands. In fact the very language of that law shows that it only intended to subserve that purpose, since it provides expressly that all sales of land, "*en que intervenga alcabala*," that is, on which that duty shall be payable, should be in writing; thus excluding from the operation of the law all sales on which no *alcabala* was payable. See Escriche. title "Alcabala."

And it would be most unreasonable to suppose, that it ever was extended to the Californias, for the following reasons:

1. Under the Spanish government the Province of Upper California was little known or thought of, but little visited or explored. The. population was poor and scanty. They never exported or imported anything.

2. For the collection of this *alcabala* a whole train of officials were required, and certainly the expense of their maintenance would never have been borne in a place or country such as this was then.

3. The Californias were only known as places where missions

were established and maintained at the cost of the government, and it can scarcely be supposed that the government would have defrayed such costs if the people themselves could have done so.

4. The Spanish government only began to hold out inducements to settlers in this country by offering them lands, and even paying the expenses of their voyage here and support afterwards. The Spanish colonization laws are well known, and they were exceedingly liberal in their terms.

Translations may be found in William Cary Jones' report on the subject of land titles in California, and also in Captain Halleck's report on the same.

It may, for the foregoing reasons, be safely assumed that the law respecting the *alcabala* was never extended to or enforced in the Californias by the Spanish government.

It never existed in Louisiana so long as it was under Spanish rule, and for that reason the Supreme Court of that State decided in Gonzales v. Sanchez, 4 Martin's La. R., new series, p. 657, that the law of the Recopilacion which required transfers of land to be in writing, did not apply, and that therefore a parol sale of lands there was good. And the Court referred as proof that a sale of such property was valid under the Spanish law to the *Siete Partidas*, which will be found on the two hundred and ninetieth page of the third volume of the Partidas.

The reference in Hoen v. Simmons, to Arrilagas decrees, is not to a decree, but is really to certain instructions which were prepared and issued in 1835, by the "*Gefatura Superior de Hacienda de Mejico,*" to the collectors of the *alcabala*, and they were an almost literal copy of the instructions which had been prepared in 1794, by Mariano de Arce y Echeagaray, Abodago de la Real Audiencia for the guidance of the collector of the alcabala under the Spanish rule. See Devall v. Coppin, 15 La., 583, for a transfer made in the same manner under Spanish law.

MURRAY, C. J., delivered the opinion of the Court—TERRY, J., concurring.

In Hoen v. Simmons, 1 Cal., 122, this Court held that a verbal sale of land was not valid, under the Mexican law. As a general proposition, it may be stated that, under the Spanish law, a sale of real estate by parole would not be void, *per se*, and that the distinction between parol contracts and specialties, known to the common law, does not exist under the civil law, or the Mexican system of jurisprudence, heretofore in force.

By Law 29, Book 8, title 13, of the Recopilacion de Indias, every sale of real estate is required to be made before the escribano of the place where the contract is entered into, or where there is no escribano, then before the Judge of the First Instance.

This law was enacted to secure a tax or revenue, on the part of the Government, arising from all sales of land, which was

called the Alcabala, and so stringent was the rule on this subject, that if the instrument lacked any of the requirements of the law, it was held void.

It is now contended that this law never was extended to California, and that even if it was, it never had any force or practical operation here. That the condition of the country, its illiterate population, together with the fact that there were no Escribanos or Judges of the First Instance residing in San Francisco, warrants the presumption that the law never was regarded as authoritative, and that evidence of a custom of conveyance existing for many years, by which these requisitions of the law seem to be disregarded, is sufficient to warrant us in determining that contracts for the sale of land were in no way controlled by it.

It may be admitted that there is some doubt whether this law was in force in California. From what we can learn, it was a fiscal law, and extended over all the States and Territories of Mexico. That it fell somewhat into disuse, there is no doubt; but, so far as we are informed, contracts for the sale of land, by the custom of the country, were required to be in writing, and although all the forms prescribed were not strictly followed, still it was necessary that the instrument should contain at least the names of the parties, the thing sold, the date of the transfer, and the price paid.

In the present case, the defendants do not claim under a verbal sale, but by a written instrument, which they contend was sufficient, under the custom of the country, to operate as a deed.

This instrument has no date, although it is shown, by every witness, that a date was necessary. It is not signed by the vendor, or by any one acting as his agent, but by a third party, in his own name, and does not purport, in any part thereof, to have been done by the request or authority of the grantor. One of the subscribing witnesses swears that his name is a forgery, and that the party whose name purports to appear as another witness is dead, and could not write. Upon the last point there is some contrariety of testimony, but a full examination of the whole evidence tends to raise the presumption of collusion and forgery.

Without laying any stress, however, on this, we are satisfied that the writing is insufficient to pass any title, for want of a date, a vendor, or authority in Noé to convey on behalf of Domingo Feliz.

We have been always willing to extend the greatest liberality to contracts executed before the acquisition of California by the United States, and to uphold them, if possible, where there were any equities existing. But to go further, and extend the rule to verbal contracts, for the sale of land, or conveyances like the

present, would open the door to stupendous frauds, and unsettle every title in the State.

Judgment reversed.