FREEMAN, J., did not sit in this cause.

---

[No. 520.   August 15, 1893.]

MAXWELL LAND GRANT COMPANY, PLAINTIFF IN ERROR, v. JOHN B. DAWSON, DEFEND-ANT IN ERROR.

EJECTMENT—TITLE—RESERVATION OF GRANT—BURDEN OF PROOF.—In an action of ejectment the plaintiff must recover on the strength of his own title; and where, in such action, plaintiff claims under deeds covering a tract of land of which the land in controversy is a part, which except and reserve a certain number of acres, conveyed by a former owner to others, and not described, the burden of proof is on plaintiff to show that the land claimed by defendant is not a part of the land so reserved.

ID—ADMISSIBILITY OF EVIDENCE FOR A PURPOSE NOT MENTIONED ON TRIAL.—Evidence must be proper for the specific purpose for which it is offered. Therefore, where evidence is rejected, which is tendered for one purpose, and it is inadmissible for that purpose, but is admissible for another purpose, not mentioned on the trial by the party offering it, its rejection is not thereby rendered erroneous.

ID—VERBAL CONTRACT FOR SALE OF LAND—CIVIL LAW.—Under the civil law, as it existed in New Mexico in 1868, a verbal contract for the sale of land could be enforced, where possession was delivered.

ERROR, from a judgment in favor of defendant, to the Fourth Judicial District Court, San Miguel County. Judgment affirmed, FREEMAN, J., dissenting.

The facts are stated in the opinion of the court.

T. B. CATRON and FRANK SPRINGER for plaintiff in error.

The acts of Mr. Dawson were not such as would tend to put the owner on inquiry, or notify him of a claim of title; especially was this true in his case, because the deed under which he bought stood upon the public records as the highest and most notorious evidence of what his real claim was. Comp. Laws, N. M., sec. 431.

No proof as to the whereabouts of the originals of the deeds offered in evidence by plaintiff, showing conveyances by Maxwell to Miller, Maulding, and Curtis, on the Vermejo, in January, 1869, was necessary as a foundation for the introduction of copies from the records. Certified copies were offered, and they were clearly admissible under section 2768, Compiled Laws. Probst v. Presbyterian Church, 129 U. S. 187.

A. A. JONES for defendant in error.

"Land which is held in good faith under a mistake as to description, or informality in the execution of the deed, will be held adversely, and title will be acquired by limitation." 1 Am. and Eng. Encyclopedia Law, 281. See, also, Tyler on Eject. & Adv. Eng. 905, 906; Crary v. Goodman, 22 N. Y. (App.) 174.

There are some cases, which upon a mere casual examination would appear to hold otherwise, but upon a close examination they will be found to sustain the doctrine above announced. Such is the case of Probst v. Presbyterian Church, 127 U. S. See same, page 191.

Under the decision of the supreme court in this case, Dawson had acquired title to the land in controversy prior to 1879, and the character of his possession after that time was immaterial.  See, also, Ewing v. Burnet, 11 Pet. 53, citing 6 Id. 513.

"Where the party offering material testimony fails to disclose to the court the object for which it is offered, and it is rejected for irrelevancy, he will not afterward be granted a new trial by showing that such evidence could have been used for a purpose material to the issue."  Barksdale v. Toomer, 2 Bailey (S. Car.), 180; 16 Am. and Eng. Encyclopedia Law, 505, and note. See, also, 2 Graham & Waterman on New Trials,  669.

"If the grant is of a tract of land, and the quantity is mentioned only incidentally, an exception of one or two acres is not repugnant, since the intention of the grantor  then is not to convey the specific quantity mentioned, but the tract of land less the one or .two acres."  5 Am. and Eng. Encyclopedia Law, 455, 456.

In such case, the effect, in respect to the thing excepted, is as if it never had been included in the deed.  3 Wash. on Real Prop. 370.

The testimony admitted, touching Dawson's ownership of the land, was in direct accord with the decision by COOLEY, J., in Sparrow v. Hovey, 44 Mich. 64.

Moreover if this testimony was incompetent it is not ground for reversal, because there was competent, prima facia evidence, uncontradicted, on the same point.  Cooper v. Coates, 21 Wall. 105; New Mexican R. R. Co. v. Hendricks, 6 N. M. 615.

Even if there were technical inaccuracies in some of the instructions given, the verdict was clearly right under the evidence, and the court will not reverse the case and grant a new trial.  Walburn v. Babitt, 16 Wall. 577; Decatur Bank v. St. Louis Bank, 21 Wall. 301.

The statute of frauds was not in force in New

Mexico in 1868, and a delivery of seizin without an instrument of writing was valid.    2 Smith's Lead. Cas. 530, 531; 3 Wash. on Real Prop. [4 Ed.], 127, 129, 329;  Walden v. Heirs of Gratz, 1 Wheat. 296.

LEE, J.—This is an action of ejectment brought to recover possession of certain lands within the Beaubien and Miranda, or Maxwell, land grant.   The plaintiff declares for the lands described in a United States patent to Beaubien and Miranda, covering one million, seven hundred and fourteen thousand acres.   Defendant disclaims as to all the land described, except certain tract described in his first additional plea, as to which he pleads not guilty, and in his third and fourth pleas makes defense as to this tract under the statute of limitations.    Plaintiff, by its replication to these pleas, joins issue, except as to a certain part of the land claimed by defendant, which part it admits to be the property of the defendant.   The real controversy, there-
EJECTMENT: title: fore, is as to the ownership of the land
reservation of
grant: burden  lying outside of the boundaries of a tract
of proof.   admitted to belong to defendant, and within the boundaries of a larger tract claimed by defendant.    That is to say, defendant's ownership of a certain tract is admitted.   He claims, not only this, but a larger one surrounding it, which is disputed.    The contention is over the land embraced in the excess. The plaintiff introduced in evidence the patent of the United States for its grant, and deeds showing a chain of title from Lucien B. Maxwell, who, it is admitted, was the former owner of the grant, down to the plaintiff, the Maxwell Land Grant Company, which deeds all contain the following reservation:    "Excepting and reserving from said grant and estate such lands, not exceeding, in the aggregate, fifteen thousand acres, as had been conveyed by the said Lucien B. Maxwell prior to the twenty-sixth day of May, 1869."    This chain of title from the original grantees named in the

patent down to the plaintiff in this suit, with proof of
heirship of some of the grantees, was all the evidence
offered on the part of the plaintiff in support of its
title to the lands in question; and with this, and
some oral testimony tending to show that the land
claimed by Dawson was a part of the land embraced
in the patent of ,the Beaubien and Miranda grant,
it rested its case.   The defendant then asked the court
to instruct the jury to return a verdict in his favor, on
the ground that the plaintiff had failed to show that
the land claimed by the defendant was not a part of
the fifteen thousand acres exempted from the deeds in
its chain of title as lands having been conveyed by
Lucien B. Maxwell prior to May 26, 1869.    This
motion was overruled, but in the instructions given to
the jury the court submitted the proposition as a ques-
tion of fact.    These instructions were as follows:
"You are instructed that the patents, documents,
deeds, and other papers introduced in evidence by the
plaintiff are sufficient to vest the legal title to the
whole of the land in controversy in the plaintiff, and
to entitle the plaintiff to the possession of the whole of
said land, unless you find from the evidence that the
defendant has a legal right to the possession thereof,
or some part thereof, either by virtue of the deed of
conveyance from Lucien B. Maxwell and wife, or by
adverse possession for a period of ten years or more
prior to the commencement of this suit, or unless you
find from the evidence that the plaintiff has failed to
prove that the land in controversy, or some portion
thereof, is not the whole or a part of the fifteen thou-
sand acres of land excepted in the conveyance from
Frank R. Sherwin and others to the Maxwell Land
Grant Company, under which plaintiff claims title to said
land."    "You are instructed that the burden of proof
is on the plaintiff to show that it has the legal title to,
and the right of possession of, all the lands in contro-

versy; and unless you find from the evidence that the
lands in controversy were included in, and not except-
ed from, the deeds of conveyance under which plain-
tiff claims title, plaintiff can not recover in this action."
The plaintiff excepted to these instructions, and assigns
the giving them as error.

It is elementary that in actions of ejectment the
plaintiff must recover on the strength of his own title,
and show that he had title to the particular land in
dispute.    An exception to a grant withdraws from the
operation of the conveyance some part or parcel of the
thing granted, which, but for the exception, would
have passed to the grantee, under the general descrip-
tion.    The part excepted is already in existence, and re-
mains in the grantor.    It is clear that the fifteen thou-
sand acres thus excepted did not pass to the grantee, and
there was no evidence offered to show what particular
part of the whole grant the reserved part comprised.
There is no presumption of law that the land claimed
by the defendant was not a part of the land reserved
in the plaintiff's deeds constituting its claim of title.
It was therefore a part of the plaintiff's case, and the
burden was on it to show that the land claimed by the
defendant was not a part of the fifteen thousand acres
which had been conveyed by the said Lucien B. Max-
well prior to the twenty-sixth day of May, 1869.
Therefore, if the plaintiff failed to establish by compe-
tent evidence that the land in controversy was not a
part of the fifteen thousand acres reserved by the deed
from Maxwell, there was certainly no error in the
instructions complained of.

It is contended, however, on the part of the plain-
tiff, that the court erred in excluding deeds of Lucien
B. Maxwell and wife to Miller, Maulding, and Curtis
Admissibility of for lands on the Vermejo, which were
evidence for pur-
pose not men-   offered in evidence by the plaintiff, which
tioned on trial.   it is claimed would have had a tendency
to show what lands had been conveyed by Maxwell on

the Vermejo prior to May 26, 1869. If these deeds had been offered in evidence by the plaintiff as a part of its case in chief for that purpose, it would have been clearly error on the part of the court to have excluded them; but they were offered in rebuttal, and for a different purpose. The evidence must be proper for the specific purpose for which it is offered. The court has a right to know what it is designed to prove, in order to determine its relevancy and materiality. "Where, therefore, evidence is rejected which is tendered for one purpose, and it is inadmissible for that purpose, but is admissible in another view of the case, not alluded to on the trial, the court will not grant a new trial as for an improper rejection of evidence." Grah. & W. New Trials, p. 669. But, even if this could be construed as error on the part of the court, is it not overcome by an admission which appears in the record of the case as follows? "It is admitted and agreed by counsel that the deeds from Lucien B. Maxwell and wife to Maulding, Miller, and Curtis, of which counsel in error offered to introduce certified copies in evidence at the trial in the court below, were duly executed, acknowledged, and recorded; that said deeds were both dated January 7, 1869, and purported to convey certain lands lying on both sides of the Vermejo river below the lands in controversy; and that the lands so conveyed as described in said deeds as all the land or ground suitable for farming or tillable or cultivating purposes in the valley or drainage of the Vermejo river, with certain boundaries, which boundaries are described by reference to natural objects, such as rocks and trees; and that no area or acreage is mentioned therein, nor is there anything in the deeds themselves whereby, without other evidence, the amount of the land thereby conveyed could be determined." The plaintiff, by virtue of this admission, so far as the determination of the amount of the land conveyed is

concerned, has the same benefit as if the deeds had been introduced in evidence, and thereby overcomes the effect of the error, if such action was error.

It is assigned by the plaintiff as error that the court erred in admitting the testimony of J. B. Dawson as to oral statements of Maulding and Curtis touching their purchase from Maxwell. The defendant introduced evidence which tended to show that in the year 1868 he entered upon the land in controversy under an agreement of purchase with one Joel Curtis, Taylor Maulding, and Dick Miller, who were at that time in possession of the land under a contract of purchase with Lucien B. Maxwell and wife, the then owners of the Beaubien and Miranda grant. The tract purchased by Miller, Maulding, and Curtis, and of which they were in possession, extended for six miles along the valley of the Vermejo river, including its drainage. Dawson's contract with them was for the upper portion of this tract, it being the land in controversy in this case, agreeing to pay therefor $3,700. That he took possession under the agreement, and, on the line fixed by them as his lower boundary, he erected a stone fence across the valley. That he has been in possession and actual occupation of the land, under a claim of ownership, since his entry, in 1868, up to the present time. The plaintiff, on rebuttal, introduced a deed from Lucien B. Maxwell and wife to the defendant, executed on the seventh day of January, 1869, which it is admitted conveys to the defendant at least a portion of the land in controversy. This deed described the land conveyed as follows. "* * * All the land or ground now suitable for farming or cultivating purposes in the valley or drainage of the Vermejo river, county of Mora, territory of New Mexico, within the following boundaries, to wit: Beginning at a certain dam at the head of a certain ditch at the right-hand point of rocks; from thence running down

on the north side of said river to a certain other pile of rocks, on a knoll or elevation, with some bushes near thereto; thence running very near southward across said river to a pinon tree to the right of a ridge near a wash, which tree is marked with the letter 'L;' thence running up said river on the south side to the place of beginning; containing about —— acres, more or less. * * *'' It is as to the ambiguity of the words of this deed, used in describing the land therein conveyed, that the principal contention in the case arises.

It is shown by the evidence that the dam referred to in the description was one that had been put in by Dawson on the upper part of his land for the purpose of irrigation. The tree marked "L" was to indicate the line between Curtis, Miller, Maulding, and Dawson. This deed from Maxwell and wife to Dawson, together with the admission as to the deeds of Maxwell and wife to Miller, Maulding, and Curtis, was the only evidence introduced on the part of plaintiff to dispute the testimony of Dawson that he had purchased from Miller, Maulding, and Curtis under their contract with Maxwell for the whole tract on the Vermejo river, and not from Maxwell himself, and that the deed made by Maxwell and wife to him was executed for the purpose of carrying out their contract with Miller, Maulding, and Curtis. The question as to whether Dawson purchased from Miller, Maulding, and Curtis under their contract with Maxwell, or whether the purchase was made by him from Maxwell and wife, becomes material, from the fact that a portion of the drainage of the Vermejo river claimed by Dawson empties into the river below the line of the land in controversy, but within the lines of the land purchased by Miller, Maulding, and Curtis from Maxwell; and whether their statements in this connection, as testified to by Dawson, were or were not properly admitted in evidence, becomes immaterial from the fact that defendant Dawson further testified

that he had conversations with Maxwell, the party from whom they claimed to have purchased, and that Maxwell pointed out the land, and also told him what amount of land he would receive under his agreement with Maulding, Miller, and Curtis, who were then in possession, and so recognized by Maxwell under his sale to them. That was all that was required to give legal effect to a contract at that time. The civil law, as it existed at the time of the acquisition of the territory, was then in full force; and, the statute of frauds being unknown to the civil law, a verbal contract for real estate where possession was delivered, could have been enforced.

Dawson testified that he did not pay the money for the purchase to Maxwell, but paid the $3,700 to Curtis, one of the parties with whom he contracted, and that Curtis paid the money to Maxwell under the Miller, Maulding, and Curtis contract, and that Maxwell and wife sent him (Dawson) the deed introduced by the plaintiff. The defendant contends that this deed was executed by Maxwell in compliance with his contract with Miller, Maulding, and Curtis, and that his and their deeds from Maxwell cover all the lands embraced in the contract between Maxwell and Miller, Maulding, and Curtis, for the six miles of land along the Vermejo river, including its drainage. This contention is strongly supported by the fact that all of the deeds were executed at the same time, and the same language used in the description of the property conveyed, as being "all the land or ground now suitable for farming or tillable or cultivating purposes in the valley or drainage of the Vermejo river," etc. In construing the language in these deeds so as to ascertain the intention of the parties, we must consider the law applicable to water rights along streams, in force at the time of their execution. The common law right of riparian ownership was not in force in this territory.

The occupant of land in each valley or watershed capable of irrigation from a stream flowing through it had, under the law, a vested interest in the common use of the water for irrigation and like purposes to which the waters were dedicated. The word "drainage" is defined to mean that district of country that drains into a river or stream, as the drainage of the valley of the river Thames, and has the same legal significance as the term "watershed," and it appears that the parties so understood the word "drainage" at the time they contracted. Dawson spoke to Maxwell in regard to where the drainage would place the line around the tract of land that he was to get, and therefore he must be understood to have known that Dawson was claiming such a line as the drainage would give him, and if such were the case that understanding or agreement would fix the boundary line of the deed, and it would be immaterial where a survey would establish the line. It would be perfectly proper for parties owning adjoining tracts of land to settle by agreement where the division line should be, and the deeds which are ambiguous and uncertain will be construed in accordance with the intention of the parties.

We have considered the real matter in contention in this case, as we understand it. The case was fully and comprehensively presented to the jury by the court in its instructions, covering every theory upon which it could be decided under the issues. The verdict returned was a general verdict for the defendant. There were no special findings asked, and there is nothing in the record to indicate upon what particular grounds the jury based their verdict. Taking into consideration the issues, the evidence, and the instructions of the court, we think the jury were warranted in returning the verdict they did; and, not finding any error in the rulings of the court which we think would justify a reversal of the case, the judgment below will be affirmed, and it is accordingly so ordered.

SEEDS and FALL, JJ., concur.

FREEMAN, J. (dissenting).—I find myself unable to agree to the conclusions reached by a majority of the court. I am free to confess that in my opinion the ends of substantial justice have probably been reached. I think it more than probable that, as a matter of equity and good conscience, the defendant in error is entitled to retain possession of the land which he claims. It is a question of the right of a private citizen to retain the use and occupation of twenty thousand acres of land carved out of a grant of two million, seven hundred thousand acres. But the conclusions of law reached by a majority of the court are calculated, in my opinion, to disturb land marks of title, and menace, to a dangerous extent, the well established rules governing title to real estate. The defendant went into possession of the premises under a contract of sale from the plaintiff's grantor. He accepted a deed, and up to the bringing of the suit claimed to hold under that deed. The first disclaimer which this record shows to have been made (and therefore the first declaration of adverse ownership outside of the boundaries as contained in his deed) is set up in his defense to this suit. The description of the land, as contained in the deed, is as follows: "All the land or ground now suitable for farming or cultivating purposes in the valley or drainage of the Vermejo river, county of Mora, territory of New Mexico, within the following boundaries, to wit: Beginning at a certain dam at the head of a certain ditch at the right hand point of rocks; from thence running down on the north side of said river to a certain other pile of rocks on a knoll or elevation with some bushes near thereto; thence running very near southward across said river to a pinon tree to the right of a ridge near a wash, which tree is marked with the letter 'L;' thence running up said river on the south

side to the place of beginning,"—while the land
claimed by him now in his plea is described as follows:
"Commencing at the dam on said river, at the upper
end of John B. Dawson's farm; thence running to a
high point of rocks on the north side of the Vermejo
canon; thence following along the top of the divide
west of Rail canon to the head of Saltpetre canon, to a
point on a line with said John B. Dawson's rock fence;
thence following said rock fence across the Vermejo to
the top of the divide between the Vermejo and Van
Bremmer canon; thence following the top of said
divide to the head of Coal canon and thence along
the top of the divide east of Coal canon to a point on
said divide nearest the place of beginning; thence
to the place of beginning."   While the boundaries set
out in the deed are vague and uncertain, it is not pre-
tended that they include all, or nearly all, the land
included in the boundaries set out in the plea.   The
deed embraces about one thousand acres, while the
plea claims twenty thousand.   It is to be observed that
the defendant now disclaims title under the deed, but
relies wholly on adverse possession under the statute of
limitation.   The deed was introduced over his objec-
tion by the plaintiff.   The defendant is allowed to state
that plaintiff's grantor, Maxwell, pointed out to him
(the defendant) the boundaries, and that they were the
same as are now set out in the plea.   "The boundaries
are what you read in that description there," is the
language of the witness.   And yet he admits that when
the plaintiff's agent came to see him about his bound-
aries he exhibited to him the deed he received from
Maxwell, and in another part of his testimony he
admits that he frequently claimed that under the deed
from Maxwell he was entitled to the "drainage of the
Vermejo between the dam and the stone fence."   It
seems perfectly clear to me that when the defendant
bought the land, and went into possession, the tract

conceded to him by the plaintiff in this suit was all that he understood he was buying. At the same time he understood that the possession of the land on each side of the stream gave him command of the water, and that this command virtually gave him control of the grazing privileges over the surrounding country, particularly within what is known as the "drainage" of the river. This was known as his "range." It was a part of the unwritten law of this territory at that time that ownership of the water commanded all that portion of the surrounding country contiguous thereto, and created an easement that was recognized by the legislature of this territory in the passage of the act approved February 15, 1889, which made it a misdemeanor to overstock a range. Defendant says that he talked with Maxwell about the extent of his possession, and that Maxwell pointed out to him his boundaries; that this was in June, 1868, six months before he received his deed from Maxwell, which was dated January 7, 1869; and that they were at that time at the stage station on the Vermejo, about four miles distant from the premises. Now, bearing in mind that this was the only time and occasion upon which Maxwell, the grantor, ever undertook to define the boundaries of the premises,—for he admits that Maxwell never came on the ground to point out the boundaries —it becomes evident that the boundaries which he undertakes to set up in his defense are purely imaginary, and have been prepared wholly to meet the exigencies of this litigation, for it must not be overlooked that in his examination in chief, wherein he undertakes to set out the circumstances under which he took possession, he says not a word about any deed from Maxwell, but claims to have purchased the land from Maulding and Curtis. He does not bring Maxwell on the scene at all, except to recognize his boundaries, and that was done at a distance of four miles

from the land; and, when asked what boundaries were recognized by Maxwell, he replied, "The boundaries were what you read in that description there," meaning defendant's plea.

The attitude of the defendant is singularly contradictory, in this: In the first place, as I have shown, he attempts to ignore altogether any paper title from Maxwell, and relies solely on a naked possession of more than ten years,—a possession acquired under a contract with Curtis and Maulding; but when confronted with a deed given him by Maxwell, which deed, it was shown, he had accepted as a muniment of his title, he attempts to show that under the vague description contained in this deed he could hold the entire tract covered by his plea. But there are two answers to this, one of which is persuasive, and the other conclusive. They are these: In the first place, the fact that he not only did not rely on his deed, but protested against its admission, affords a strong presumption that he did not regard it as covering the amount of land he claimed. If it did include the same land covered by his plea, it would conclude this whole controversy. The plaintiff admits that he is entitled to the land covered by this deed. But, in the second place, the deed negatives this idea. It purports to convey all the land now suitable for farming or cultivating purposes in the valley or drainage of the Vermejo river, county of Mora, territory of New Mexico, "within the following boundaries." The same theory of construction that would, under this description, include the entire valley or drainage of the river, would include the entire county of Mora, and the territory of New Mexico. The land conveyed is not the "valley" or the "drainage," but certain land within a given boundary; the tract thus bounded lying in the valley or drainage of the river, and in the county and territory named. This deed, he admits, he received from

Maxwell shortly after he went into possession. He did not at that or any subsequent time prior to the institution of this suit repudiate this deed. On the contrary, he allows his grantor to suppose that he was holding under this deed, and when his grantor's vendee, the plaintiff, called on him to inquire as to his boundaries, he exhibited this deed, and continuously claimed to hold the entire tract covered by his plea until the institution of this suit, when, on being advised, no doubt, that under his twenty years' possession of this "drainage" or "valley," or what the witnesses term his "range," he could hold twenty thousand acres instead of the one thousand covered by his deed, he determined to repudiate the deed, and hold the larger tract under title derived by naked possession.

There is another singular feature connected with this defense. The defendant claims to have gone into possession in 1868, under contract with Maulding and Curtis who claim to own a "block" lying on the river. Now, at that time the title was not only not in Maulding and Curtis, but it was not in Maxwell, for it was not until two years after that Maxwell bought the last outstanding interest in the grant, and it was not until May 19, 1879, eleven years after the defendant had gone into possession, that a patent from the government, in favor of Beaubien and Miranda, issued. Now, granting that Maxwell could anticipate his title so far as to convey by deed an interest not yet acquired from the government, it will not be pretended that a naked possession existing at the date of his patent can create title as against the patentee. At the date, therefore, of the issuance of the patent, the defendant was not, nor could he be, invested with an adverse holding beyond the express terms of his deed from Maxwell. In order, therefore, to create an estate that will defeat the title of the patentee, he must show that for ten years prior to the institution of this suit he was "holding or

claiming by virtue of a deed or deeds of conveyance, devise, grant, or other assurance purporting to convey an estate in fee simple." Comp. Laws, sec. 1880. The defendant insists, however, that under his deed he can set up an adverse title to a greater quantity of land than is embraced within its boundary, if he can show that he was in possession of said amount under a mistake as to his boundaries; citing Tyler, Ejectment and Adverse Enjoyment, page 905, as authority for this proposition. He can not avail himself of this defense, however, for the reason that neither in his pleadings nor in his testimony does he rely on the deed, but, on the contrary, expressly repudiates it. If he had set up the deed as matter of defense, and had introduced proof tending to show that by reason of the ambiguity of its recitals he had a right to suppose that it conveyed the land in controversy, and that issue had been properly submitted to the jury, I am of the opinion that a verdict in his favor on such an issue would have concluded the whole controversy. But this deed, which was admitted over the objection of the defendant, was submitted to the jury under the tenth instruction asked for by the defendant, and in terms that were well calculated to mislead the jury, for they were told, at request of defendant, that the defendant did not rely exclusively on the deed. And this whole defense, which has been conducted with singular ability, is an ingenious application of the doctrine, "heads, I win; tails, you lose," and the jury were authorized to recognize the deed if they could make it support the defendant's contention, or to discard it if it supported the plaintiff's case. It is an elementary doctrine that in ejectment the plaintiff must recover on the strength of his own, and not on the infirmity of the defendant's title, but the defendant can not resist the plaintiff's demand by setting up two absolutely contradictory defenses; that is to say, he can not at the same time hold under and

adverse to the plaintiff; he can not take possession
under a deed conveying one hundred acres, and there-
after create a title to two hundred without showing a
distinct adverse claim to one hundred acres not em-
braced in his deed.    The vendor, having placed him in
possession under a deed conveying one hundred acres,
has a right to presume that no more than that amount
is claimed until some distinct act on his part discloses
an intent to claim land not embraced in his deed.    In
other words, a vendee, while holding possession under
a deed, is estopped to deny the title of the vendor.    He
can not set up an outstanding title in himself.    Brown
v. Baldwin, 16 N. Y. 359; Jackson v. Harrison, 17
Johns. 66; Jackson v. Ayres, 14 Johns. 223.    If he
undertakes to hold under this deed, he must confine
himself to the bounds.    Sedg. & W. Tr. Title Land, p.
577; 73 Mo. 548; 49 Mo. 441; Pope v. Hanmer, 74 N.
Y. 244.    So long as he is holding under his deed, good
faith to his vendor requires that he shall be bound by
its recitals.    50 Mo. 548; 7 Jones, Law (N. C.), 430;
22 N. Y. 170.    In this case the record fails to disclose
any act upon the part of the defendant in error indicat-
ing an intention to hold adversely to his grantor any
lands outside of the boundaries of his deed, prior to
the filing of his plea in this case.    Much was said in
the argument about the use of the term "drainage."
The whole burden of the defendant's contention is that
he was for more than ten years prior to the institution
of this suit in possession of the "drainage" of the
river.    I submit that this controversy offers no occa-
sion for the definition of the term "drainage."    I
agree perfectly with the majority of the court as to the
meaning of this word, but the defendant in error did
not, under his deed, acquire any title to the "drain-
age" of the Vermejo river, any more than he acquired
title to the county of Mora and the territory of New
Mexico.    He bought a certain strip of land within the

drainage, and on each side of the river; and I submit
that the statement in the opinion of a majority of the
court that "Dawson spoke to Maxwell in regard to
where the drainage would place the line around the
tract of land that he was to get, and therefore must
have been understood to have known that Dawson was
claiming such a line as the drainage would give him,"
is not supported by the testimony, for the only conver-
sation he ever had with Maxwell as to his boundaries
took place four miles distant from the land, and the
only testimony in the record as to Maxwell's recogni-
tion of his boundaries is given in his own testimony,
as follows, on page 246 of the record: "Question.
State whether or not there was ever any pointing out
of the boundaries of your possession of the land by
you and Mr. Maxwell. (Objected to by plaintiff's
counsel. Objection overruled. Exception reserved.)
Answer. Just between us? Q. Yes, sir. A. Yes,
sir; there was. Q. State what boundaries were pointed
out. (Objected to by plaintiff's counsel. Objection
overruled by the court. Exception reserved.) The
Court: You can state what boundaries you fixed upon
the earth's surface with regard to your respective pos-
sessions. A. The boundaries were what you read in
that description there." On cross-examination he
admits that the "pointing out" took place four miles
distant from the land. Surely, no one can take this
record, and upon examination thereof come to the con-
clusion that Maxwell, at the Vermejo station, four
miles from the property in controversy, pointed out to
the defendant in error a description of his boundaries,
as set out in his plea in this case. I pass over the fact
that plaintiff's vendor, Maxwell, is dead, and can not
be heard to give his explanation of the transaction. I
pass over the further fact that, in my opinion, the tes-
timony given by the defendant in error as to his con-
versation with Maulding and Curtis, his copartners,

was clearly incompetent for the purpose of saying that, admitting its competency, it wholly fails, in my opinion, to maintain the defendant's claim to what he describes as the drainage of the river.

It is insisted for the defendant in error that at the date of his purchase from Maxwell, to wit, in 1868, the statute of frauds was not in force in this territory, and therefore a verbal sale, accompanied by a delivery of possession, operated to confer a perfect title.    I am of the opinion that this proposition is not only unsound in the abstract, but clearly erroneous in its application to the facts in this case, for admitting that the statute of Charles II had not at this time been incorporated into the jurisprudence of this country, and that title to land at this time was governed by the civil law, a a paper title was recognized as creating the highest character of estate.    But I insist that at the date of this transaction a deed was necessary for the conveyance of title to real estate in this territory.    By the acquisition of this territory under the treaty of Guadalupe Hidalgo, we inherited, for the time being, the civil law as it was administered at that time by Spain and Mexico.    It was held by the supreme court of the United States in the Percheman case wherein Chief Justice MARSHALL discusses this question very elaborately, that while the right to the soil is changed by the acquisition of territory, and while the allegiance of the inhabitants is shifted from the old to the new government, that their property rights are not altered or changed, and the acquisition of territory brings with it always an implied, and generally an express, obligation upon the part of the new government to preserve and protect those rights.    7 Pet. 86.    Before proceeding, however, to examine the doctrine of the civil law, as administered by Spain and Mexico, at the time of the acquisition of this territory, it is well enough to

observe that from that date the tendency has been towards the principles of common law.

There are not wanting authorities to the effect that the mere acquisition of territory upon the part of the United States, and the extension over such territory of the jurisprudence of our government, carries with it, proprio vigore, the common law. It was held by the supreme court of Utah that it did not require an act of the legislature to adopt the common law in that country. Thomas v. U. P. Railroad Co., 1 Utah, 232. And in Ohio, where, by the act of October 1, 1795, the legislature adopted the common law as a rule of practice and decision, which act was repealed by the act of January 2, 1806, the supreme court of that state, in construing this latter act in the case of Drake et al. v. Rogers, 13 Ohio St. 29, held that it did not require any statute to put in force the common law of England, and that, therefore, the repeal of the former act by the latter did not operate as a repeal or abrogation of the common law. Chancellor Kent, in speaking of the common law, as administered in this country, adopts the following language: "We live in the midst of the common law. We inhale it at every breath, imbibe it at every pore. We meet it when we wake and when we lie down to sleep, when we travel and when we stay at home. It is interwoven with the very idiom that we speak. And we can not learn another system of laws without learning at the same time another language." It is admitted, however, that this doctrine does not apply so fully to the territories acquired by this country from France and Spain and Mexico, which were civil law countries. What I affirm, however, is that the title set up by the defendant in this case can not be supported by the most liberal construction of the civil law, as derived from the latter country. In the case of Hoen v. Simmons, 1 Cal. 122, the supreme court of that state uses the fol-

lowing language: "But the defendants say that by the Mexican laws a verbal contract for the sale of land was equally valid as if it were in writing. We think not, and so held in Harris v. Brown, ante, 98. There is no doubt about the correctness of that decision. There never has been a time, since the adoption of the Fuero Juzgo, in which lands could be conveyed under the Spanish or Mexican law without an instrument in writing, unless it were, perhaps, in the case of an executed contract, where corporeal possession was delivered at the very time of the sale by actual entry upon the premises, and the doing of certain acts analogous to the livery of seizin at common law. Had this not been so, one main branch of the revenues of the Spanish crown and Mexican republic, called the 'Alcabala,' being a duty payable on the transfer of land, would have been easily evaded. By Law 29, lib. 8, tit. 13, of the Recopilacion de Indias, every sale of real estate was required to be made before the escribano of the place where the contract was entered into, and, if there were no escribano, before the judge of first instance; and these officers were required to furnish a copy and statement of the writings and contracts made before them, with the day, month, and year in which they were made, the names of the seller and purchaser, and the property sold and exchanged, and the price. Arrillaga's Decretes (volume for 1838, p. 421)." This opinion concludes with the following declaration: "We do not doubt that a writing was as necessary for the transfer of lands in Mexico as it is in the United States." This was also affirmed in the case of Hayes v. Bona, 7 Cal. 159, where the court, speaking through Mr. Justice Murray, said: "In Hoen v. Simmons, 1 Cal. 122, this court held that a verbal sale of land was not valid under the Mexican law. As a general proposition, it may be stated that under the Spanish law a sale of real estate by parol would not be void per se,

and that the distinction between parol contracts and specialties, known to the common law, does not exist under the civil law, or the Mexican system of jurisprudence heretofore in force. By Law 29, bk. 8, tit. 13, of the Recopilacion de Indias, every sale of real estate is required to be made before the escribano of the place where the contract is entered into, or where there is no escribano, the judge of the first instance.'' This whole question was afterward disposed of in a very summary manner in the case of Stafford v. Lick, 10 Cal., in an opinion delivered by Chief Justice TERRY, Justices FIELD and BURNETT concurring. The case is a short one, and I quote it in full: ''This is an action of ejectment for a lot in San Francisco. Both parties deraign title from the same source, defendants claiming under a paper executed on the sixth of October, 1846, which is in the following words: 'By this present I give ample and sufficient power to Don (17) Jose de Jesus Noe to use or dispose of my lot, which I hold (or have) granted, as may seem best to him; and in testimony I give the present power, in the place of Yerba Buena, the sixth day of October, 1846. Maximo Z. Fernandez,'—and the main question raised by the record is whether this paper is a sufficient conveyance. In Hayes v. Bona, 7 Cal. 158, we held that contracts for the sale of land, under the Mexican law, and by the custom of California, required to be in writing, 'and although the forms prescribed were not strictly followed, still it was necessary that the instrument should contain at least the names of the parties, the thing sold, the date of the transfer and the price paid.' This view is decisive of this case, and on the authority of the opinion in Hayes v. Bona, the judgment of the court below is reversed.'' It seems to me that, in the absence of any statutory legislation on the subject, this disposes of the question, so far as concerns the position taken by a majority of the court,—that the

sale of this twenty thousand acres from Maxwell to the defendant in error was a good civil law sale. The most liberal interpretation of that contract does not bring it within a single requirement of the civil law, as it existed at that time. There were no well defined boundaries; there was no delivery of possession; there was no acknowledgment before any of the authorities; there was no erection of monuments; there was no writing containing the names of the parties, the thing sold, the date of the transfer, and the price paid. Indeed the whole transaction did not exhibit the faintest shadow of a trace of civil law conveyance of real estate, as understood and administered by the laws of Mexico. But we are not left to any doubtful construction of the civil law in determining whether the defendant in error took any title under the verbal arrangement with Maulding and Curtis, which he says was afterward recognized by Maxwell pointing out to him his boundaries at a distance of four miles. The legislature of this territory, in 1852, thought it necessary, in order to preserve Spanish and Mexican titles derived before its acquisition, to pass an act specially validating them, and for that purpose provided by the act of January 9, 1852, that "all manner of contracts celebrated under the laws of Mexico shall be and are held settled under the same laws, without being affected in the final decision of them by the application of any territorial law." It was further provided that contracts entered into from the time of its occupation by Gen. Kearney should be governed by the rule or law under which they were authorized, without being annuled in any manner, and this provision was made especially applicable to "grants of tillable lands made by the authorities of the same period." It seems, however, that even at that early date the people of this territory were anxious to reform the civil law mode of acquiring real estate, and, fearing lest the provisions

already quoted might in some manner be regarded as
authority for the continuation of that system, the same
legislature, three days thereafter, to wit, on the
twelfth day of January, 1852, enacted certain provi-
sions, which are carried into the Compiled Laws at sec-
tion 2748, which provisions created a perfect code for
the regulation of transactions involving the title to real
estate. The third section of that act provides, substan-
tially, that any person holding any right or title to real
estate in this territory, be it absolute or limited, in pos-
session, remainder, or reversion, may convey the same
in the manner and "subject to the restrictions prescrib-
ed by this act." The thirteenth section provided for
"signing, acknowledging, and the certification and
registration of such titles," while section 20 made such
writing evidence in all the courts without further
proof. It was while these statutes were in force that
this transaction took place. It was for the purpose of
conveying the estate under this statute that the deed
from Maxwell to Dawson was executed, and by the lat-
ter recorded. It was under this deed that Dawson
held possession of the land until the lapse of time and
the death of Maxwell made it possible for him, as he
supposed, to acquire title to a much larger portion of
land under a verbal agreement tenfold more vague and
uncertain than the language used by the sons of Heth
in the transfer to Abraham of the country surround-
ing the cave of Machpelah. It is insisted, however, for
the defendant, that his vendor, Maxwell, recognized
the boundaries which he sets out in his plea. I have
already endeavored to show that this so-called recogni-
tion is too vague to be regarded by this court as fixing
the boundaries sought to be established in this case.
But, were it otherwise, there is another consideration
that, to my mind, destroys this defense. Passing over
the fact that Maxwell is dead, and therefore can not be
heard to tell his story, I am of the opinion that any

statements made by Maxwell calculated to impair the title of his vendee, the plaintiff in this case, were incompetent. Monnot v. Husson, 39 How. Pr. Rep. 453.